RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0136P (6th Cir.)
File Name: 02a0136p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

No. 00-3559

FRED E. HENNING,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 95-00758—James G. Carr, District Judge.

Argued: June 14, 2001

Decided and Filed: April 18, 2002

Before: BOGGS and SUHRHEINRICH, Circuit Judges;
CLELAND, District Judge.[*]

———————

## COUNSEL

**ARGUED:** Thomas J. Kelley, CLINE, COOK & WEISENBURGER CO., Toledo, Ohio, for Appellant. Jonathan L. Marcus, DEPARTMENT OF JUSTICE,

———————

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

Washington, D.C., for Appellee.  **ON BRIEF:** Thomas J. Kelley, Eugene F. Canestraro, CLINE, COOK & WEISENBURGER CO., Toledo, Ohio, for Appellant. Jonathan L. Marcus, DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

—————————

**OPINION**

—————————

CLELAND, District Judge.  This case is before us for review for a second time.[1]  In this appeal, Defendant-Appellant Fred E. Henning challanges his convictions on two counts of bank fraud in violation of 18 U.S.C. § 1344 and three counts of misapplication of bank funds in violation of 18 U.S.C. § 657.  For the reasons stated below, we REVERSE the judgments imposed against Henning, VACATE the convictions, and REMAND.

## I.  Background

### A.  Factual Background

Defendant Fred E. Henning became the vice president and general counsel of First Federal Savings and Loan Association of Toledo ("First Federal") in 1978.  He also served on First Federal's board of directors and as a permanent member of the loan committee.  Donald Baker, the chief executive officer and chairman of the board, and John

—————————

[1] This case previously came before us on the Government's appeal. As will be discussed in the factual section, the district court had granted Defendant Henning's motion to vacate his substantive convictions.  On appeal, we held that the district court was without jurisdiction to grant the motion.  *United States v. Henning,* No. 98-3748, 1999 WL 1073687 (6th Cir. 1999).

conferred by Rule 52(b) should be employed 'in those circumstances in which a miscarriage of justice would otherwise result.'" *Olano*, 507 U.S. at 736 (quoting *United States v. Young,* 470 U.S. 1, 15 (1985)). Rule 52(b) does not require a showing of actual innocence. *Id.* Instead, the Supreme Court has held that the courts "should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (alteration in original) (quoting *United States v. Atkinson*, 297 U.S. 157 (1936)). An important tenet of our criminal justice system is that a defendant is innocent until proven guilty beyond a reasonable doubt. When it is uncertain whether a defendant was convicted by the appropriate standard, the integrity of the judicial system is undermined. The district court's error in failing to address the *Pinkerton* issue runs "contrary to the administration of justice" and "substantially and adversely affects the integrity of the judicial process." *United States v. Stubbs*, 279 F.3d 402, 410 (6th Cir. 2002). We will therefore exercise our discretion under Federal Rule of Civil Procedure 52(b), and correct the plain error.

## IV.  Conclusion

For the reasons stated above, we find that the district court committed plain error by failing to recognize the *Pinkerton* implications that remained after it reversed the conspiracy conviction. Accordingly, we REVERSE the judgments imposed against Henning, VACATE the convictions, and REMAND this matter for further proceedings consistent with this opinion.

Waldvogel, the president of First Federal, were the other permanent members of the loan committee.[2]

In September 1982, Federal Home Loan Bank Board ("FHLBB") regulators instructed First Federal to stop using letter appraisals in determining whether to approve loans. On January 12, 1983, First Federal's board of directors, including Henning, signed a letter to the FHLBB assuring that no loans would be approved "without the completed appraisal in hand." Nevertheless, throughout the mid-1980s, Henning, Don Baker, Waldvogel, and the other members of the loan committee continued to approve loans before completed appraisals had been prepared. A full appraisal would be completed and backdated and the letter appraisal destroyed before bank examiners arrived to conduct an audit.

One of First Federal's largest borrowers during this time was William Baker ("Bill Baker"), a real estate developer and Don Baker's son.[3] When Bill Baker sought loans from First Federal, Don Baker directed Leon Corns, First Federal's in-house appraiser, to prepare letter appraisals that would support Bill Baker's loan applications.[4] In particular, on Don Baker's instructions, Corns prepared false appraisals for Bill Baker's loan applications in connection with Brandywine Country Club ("Brandywine") and Anchor Pointe Marina ("Anchor Pointe"), two properties Bill Baker purchased from First Federal. By overvaluing both properties, Corns's appraisals allowed First Federal to dispose of them without showing a loss on its books and made it appear that the bank was receiving greater security for its loans to Bill Baker than it actually was. Corns's appraisals also overvalued the

---

[2]Don Baker pleaded guilty to three counts of misapplication of bank funds, and Waldvogel pleaded guilty to one count of bank fraud.

[3]Bill Baker pleaded guilty to three counts of misapplication of bank funds.

[4]The Government decided not to prosecute Corns in exchange for his cooperation.

properties that Bill Baker traded in for equity credit on the Brandywine and Anchor Pointe purchases. All told, First Federal extended five loans to Bill Baker on Brandywine and one loan on Anchor Pointe.

As a member of the loan committee, Henning voted to approve each of these loans. FBI Special Agent Mike Rolf, accompanied by Special Agent William Comes, interviewed Henning in December 1990 as part of an investigation of possible wrongdoings at First Federal. Henning was not a target of the investigation at the time. During the interview, Henning made comments that the Government understood to be admissions that, when he voted to approve the loans, he knew Brandywine and Anchor Pointe, as well as the properties Bill Baker traded in for Brandywine and Anchor Pointe, were overvalued. In particular, Henning referred to the Anchor Pointe transaction as "garbage in garbage out" and used the phrase "I knew" and "we knew" when describing his knowledge that Corns's appraisals overvalued the Anchor Pointe and Brandywine properties and Bill Baker's trade-in properties.

According to the Government, Henning later attempted to change his story to deny knowledge of the false appraisals. Henning also discussed how it was difficult to raise his concerns with Don Baker, who was a domineering individual. The Government asserts that Henning cooperated with Don Baker because he did not want to lose his job.[5]

---

[5] This assertion was based (1) on Joseph O'Leary's personal opinion that Henning was concerned about losing his job if he tried to stop the Baker loans and (2) Robert Walker's trial testimony that

> Discussion was going on after one of the loan committees, and [Henning and Waldvogel] realized on the particular loan that was made, the appraisal was questionable, though none of us were appraisers, and then they would question the fact that they couldn't do anything about it because Mr. [Don] Baker had the necessary votes he would need with the outside directors to pass the loan, but they then would say that there was no one loan worth losing their job over.

---

*Pinkerton* issue.[10] In its June 12 order, the district court stated that it was "convinced that [its] erroneous submission to the jury of a *Pinkerton* charge is likely to have resulted in substantial injustice to the defendant, in that the jury quite possibly convicted him on an invalid ground rather than one of two possible valid ones." Thus, if the district court had considered the *Pinkerton* implications when it reversed the conspiracy conviction, it would have vacated the substantive convictions. Henning has therefore established that his substantial rights were affected by the district court's error of failing to consider the effect of its August 8 order on the substantive crimes.[11]

## D. Fairness, Integrity or Public Reputation

When the first three requirements of Rule 52(b) are met, this court may exercise its discretion and overturn a jury verdict only when the error affects the fairness, integrity, or public reputation of judicial proceedings. "[T]he discretion

---

[10] Unfortunately, as we held in the earlier appeal of this order, the district court was without jurisdiction to hear the motion upon which the June 12 order was predicated. *Henning,* 1999 WL 1073687.

[11] This holding is limited to the unique facts of this case. Other courts have held that reversal is not mandated where the court is persuaded beyond a reasonable doubt that the jury would have convicted the defendant of the substantive count either as aiders and abettors or as principals. *See, e.g., United States v. Olano,* 62 F.3d 1180, 1199-1200 (9th Cir. 1995); *United States v. Manarite,* 44 F.3d 1407, 1414 n.9 (9th Cir. 1995); *United States v. Castaneda,* 16 F.3d 1504, 1511-12 (9th Cir. 1994).

We need not decide if the convictions would remain under such circumstances, because in this case reasonable doubt clearly exists whether the jury would have convicted Henning as a principal or as an aider and abettor. As indicted in the "Factual Background" section, there was sufficient, but not overwhelming, evidence to convict Henning of the substantive counts as a principal or as an aider and abettor. In its June 12 order, the district court found that there was reasonable doubt whether the jury would have convicted absent the *Pinkerton* charge. Indeed, the district court could not even find that it was more likely than not that the jury would have convicted.

In *Griffin*, the Supreme Court noted that, while "[j]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law," they "*are* well equipped to analyze the evidence." *Id.* at 59 (emphasis in original). When faced with alternative theories of liability, jurors can rely on their own intelligence and experience to save them from relying upon a factually inadequate theory. *Id.* Thus, the Court recognized the general rule that "*in the absence of anything in the record to show the contrary*, the presumption of law is that the court awarded sentence on the good count only." *Id.* at 50 (emphasis added) (quoting *Claassen v. United States,* 142 U.S. 140, 146-147 (1891)).

While normally the Government could rely on the presumption that jurors convicted on the factually sufficient theory, in this case there is evidence to the contrary, indicating that the jurors may have convicted on the factually inadequate theory. The jurors originally convicted Henning on the conspiracy charge, which the district court judge later determined was not supported by sufficient evidence. It is therefore not only logical, but likely that the jurors may have convicted Henning on the substantive counts based upon *Pinkerton* liability. Indeed, courts presume that jurors "attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). The problem with the substantive convictions is that the jury could have closely followed the jury instructions and convicted Henning based upon the actions of his associates. Thus, *Griffin* would not have controlled the district court's analysis of the *Pinkerton* issue.

Instead, had the district court considered the *Pinkerton* implications it would have vacated the conviction and ordered a new trial. This is obvious, based upon the court's decision in its June 12 order, when it ultimately considered the

Henning denies having known at the time he voted to approve the Baker loans that the appraisals submitted were false. He argues that the expression "garbage in garbage out" meant that the properties at issue were burdensome to their owners and that the "I knew" or "we knew" phrases referred to his knowledge that the values of Baker's trade-in properties were inflated, though he maintains that he did not gain this knowledge until 1990. Henning admits that letter appraisals were routinely used, including on the Brandywine and Anchor Pointe transactions, even after First Federal agreed with FHLBB to cease relying upon them. Finally, he avers that he was "concerned" about the appraisals and recognized that something was wrong with Bill Baker's net worth statement.

In connection with the First Federal investigation, the Government charged Henning with conspiracy under 18 U.S.C. § 371, bank fraud under 18 U.S.C. § 1344, and misapplication of bank funds under 18 U.S.C. § 657.

### B.  Procedural Background

On February 21, 1997, the district court charged the jury based upon the legal rule established by the Supreme Court in *Pinkerton v. United States*, 328 U.S. 640 (1946). In the *Pinkerton* charge, the court instructed the jury that it could convict Henning on the substantive counts either based upon his own acts, as an aider and abettor, or, if the jury found that Henning was a conspirator, based upon the acts of his co-conspirators.[6]

---

[6] The district court instructed the jury as follows:

Instruction 43: Liability for substantive offenses committed by others.

Counts 2, 3 and 4 of the indictment accuse the defendant of committing the crime of bank fraud. Counts 5, 6, 7, 8 and 9 of the indictment accuse the defendant of committing the crime of misapplication of First Federal's funds.

There are two ways that the government can prove the defendant

_____

guilty of these crimes. The first is by convincing you that he personally committed or participated in the crime. The second is based on the legal rule that all members of a conspiracy are responsible for the acts committed by the other members as long as those acts are committed to help advance the conspiracy and are within the reasonably foreseeable scope of the agreement.

In other words, under certain circumstances, the act of one conspirator may be treated as the act of all. This means that all the conspirators may be convicted of a crime committed by only one of them, even though they did not personally participate in that crime himself.

But for you to find the defendant guilty of bank fraud or misapplication of First Federal's funds based on this legal rule, you must be convinced that the government has proved each and every one of the following elements beyond a reasonable doubt:

First, the defendant was a member of the conspiracy charged in count one of the indictment.

Second, that after he joined the conspiracy and while still a member of it, one or more of the other members--while he was still a member of it, one or more members committed the crime of bank fraud as alleged in counts 2 through 4 or misapplication as alleged in counts 5 through 9.

Third, such crime was committed to help advance the conspiracy.

And fourth, the crime was within the reasonably foreseeable scope of the unlawful project.

The crime must have been one that the defendant could have reasonably anticipated as a necessary or natural consequence of the agreement. This does not require proof that the defendant specifically agreed or knew that the crime would be committed. The government must prove that the crime was within the reasonable contemplation of the persons who participated in the conspiracy. No defendant is responsible for the acts of others that go beyond the fair scope of the agreement as the defendant understood it.

If you are convinced that the government has proved all of the elements by proof beyond a reasonable doubt, say so by

cannot be convicted for the crimes of another. Thus, in this case, the Fifth and Sixth Amendments required the Government to prove, among other elements, the personal guilt of Henning.

In light of the August 8 ruling, however, it is possible that the Government obtained a conviction based upon the culpability of others, even though there was no proof of a conspiracy. Failure to recognize this issue, and properly address it, was plain error.

### C.  Substantial Rights

Having found that the district court committed plain error in failing to recognize the implications of its August 8 ruling, we must now determine whether this error affected Henning's substantial rights. Thus, we must determine whether the error was prejudicial, that is, whether it "affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734. As this is a plain error case, it is Defendant's burden to establish prejudice. *Id.*

At first blush, this case appears to be controlled by *Griffin v. United States*, 502 U.S. 46 (1991). In *Griffin*, the Supreme Court held that a conviction is not reversible where a jury convicts on a general verdict form and one of the bases upon which they could convict is supported by insufficient evidence, so long as an alternative basis is supported by sufficient evidence. *Id.* at 60. Thus, it could be argued that, had the district court considered the effect of its August 8 order on the substantive convictions, it would have been controlled by *Griffin*. If such were the case, the district court would not have reversed the substantive convictions if any of the theories of liability were supported by sufficient evidence. *Griffin*, however, was based on certain legal premises which are not present here.[9]

_____

[9]Possibly recognizing the deficiencies in a *Griffin* argument, the Government "decided not to press *Griffin's* applicability on this appeal."

consider that, pursuant to the *Pinkerton* instruction, the jury may have convicted Henning on the substantive counts only because they believed he was guilty of conspiracy. Due to the close relationship between the substantive and conspiracy crimes, which was created by the *Pinkerton* instruction, an automatic consideration of the viability of the substantive convictions should have been undertaken by the district court when the defendant was acquitted of the conspiracy conviction in a post-trial order. The district court committed error by failing to undertake such a consideration.

## B. Plain Error

The error the district court committed was plain. The word "plain" is "synonymous with 'clear' or, equivalently, 'obvious.'" *United States v. Olano*, 507 U.S. 725, 734 (1993). To satisfy this test, the error must be plain "under current law." *Id.* "Current law" is law as it exists at the time of appellate review. *Johnson*, 520 U.S. at 468. "Plain errors are limited to those harmful ones that are so rank that they should have been apparent to the trial judge without objection, or that strike at the fundamental fairness, honesty, or public reputation of the trial." *United States v. Goodlett*, 3 F.3d 976, 978 (6th Cir. 1993) (citing *United States v. Causey*, 834 F.2d 1277, 1281 (6th. Cir. 1987)). "Plain error is defined as an egregious error, one that directly leads to a miscarriage of justice." *United States v. Busacca*, 863 F.2d 433, 435 (6th Cir. 1988).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI, cl. 1. This right includes "as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of 'guilty.'" *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993). Furthermore, the Sixth Amendment is interrelated with the Due Process Clause of the Fifth Amendment, which requires the prosecution to prove each of the elements of the alleged offense "beyond a reasonable doubt." *Id.* at 277-78. It is axiomatic that, absent evidence of a conspiracy, one

The jury convicted Henning on one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; two counts of bank fraud, in violation of 18 U.S.C. § 1344; and three counts of misapplication of bank funds, in violation of 18 U.S.C. § 657.[7]

On March 4, 1997, within seven days after the jury's verdict, Defendant filed a motion for judgment of acquittal and a motion for new trial. On August 8, 1997, the district court issued an order granting Defendant's motion for judgment of acquittal on the conspiracy count and denying the motion as to the five substantive counts.[8] Specifically, the court found that there was insufficient evidence to convict Henning on the conspiracy charge.

On December 10, 1997, Henning filed a "Motion to Consider Further Motion For New Trial Based Upon Court's Order Dated August 8, 1997." On June 12, 1998, the court granted this motion, vacating Defendant's conviction on the substantive counts and granting a new trial. The court found that, in light of its submission of a *Pinkerton* instruction to the jury, it should have vacated the substantive convictions when it reversed the conspiracy conviction in the August 8 order. The Government appealed the June 12 vacation of the substantive counts, and we reversed, finding that the district court was without jurisdiction to hear Henning's "Motion to Consider Further Motion." *United States v. Henning,* No. 98-3748, 1999 WL 1073687 (6th Cir. 1999). The case was then remanded for sentencing.

---

returning a guilty verdict on this charge. If you have a--if you have a reasonable doubt about any one of them, then the legal rule that the act of one conspirator is the act of all would not apply.

[7] The jury acquitted Defendant on one count of bank fraud and two counts of misapplication of bank funds.

[8] The court also denied Defendant's motion for a new trial.

On April 17, 2000, Henning was fined $25,000 and sentenced to four months imprisonment, to be followed by two years supervised release. This appeal followed.

Henning asserts that a new trial on the substantive counts is necessary because, in hindsight, the jury was incorrectly charged with the *Pinkerton* instruction. Specifically, Henning contends that insofar as (1) the jury rendered a general verdict finding him guilty of conspiracy and of certain substantive offenses and (2) he was acquitted of the conspiracy conviction in a post-trial order, the substantive convictions must be vacated because it is impossible to know whether the jury convicted him legally (based upon his own acts) or illegally (based upon the acts of others). The Government disagrees, arguing that the submission of the *Pinkerton* charge was not erroneous because there was sufficient evidence to support that Henning was a member of the conspiracy to defraud First Federal. Alternatively, the Government argues that the error, if any, was not plain because the sufficiency question was a close one, that Henning was not prejudiced by the alleged error because the jury clearly would have convicted him of the substantive charges in the absence of the *Pinkerton* instruction, and that giving the *Pinkerton* instruction did not constitute a miscarriage of justice.

## II. Standard

When a criminal defendant has failed to object below, he must demonstrate that the error was plain as defined by Federal Rule of Criminal Procedure 52(b) before the court may exercise jurisdiction to correct the error. *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998). Federal Rule of Criminal Procedure 52(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." *Id*. The *Pinkerton* issue was not timely raised by the parties or the trial court. Thus, we review the district court's failure to address the possibility of conflict between its August 8, 1997 reversal of the conspiracy conviction and the viability of the

substantive convictions, in light of the *Pinkerton* instruction, for plain error.

## III. Discussion

The Supreme Court has established a four-part test that a defendant must meet in order to establish plain error. *See Johnson v. United States*, 520 U.S. 461, 467 (1997). Under Rule 52(b), "a defendant must show (1) that an error occurred in the district court; (2) that the error was plain, *i.e.*, obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Koeberlein*, 161 F.3d at 949 (relying on *Johnson*, 520 U.S. at 467). Following these factors, the court concludes that the district court's failure to address the *Pinkerton* issue in its August 8 order was plain error.

### A. Error

Henning correctly admits that "[o]nce the trial court determined to send the conspiracy charge to the jury, it could not have been error to also give a *Pinkerton* instruction." Indeed, while in hindsight the conspiracy count should not have been submitted to the jury due to the insufficiency of the evidence, it was not inappropriate for the district court to charge the jury with a *Pinkerton* instruction once it had decided that the conspiracy count would go to the jury for resolution.

We find, however, that the district court erred in its August 8, 1997 order, in which Henning was acquitted of the conspiracy conviction, by failing to recognize the problems with the *Pinkerton* instruction in light of its ruling.

The *Pinkerton* rule is necessarily premised on the existence of a conspiracy. *See generally Pinkerton*, 328 U.S. at 646-47. In this case, therefore, the jury was correctly instructed to analyze whether the substantive crimes were committed in furtherance of the conspiracy. *Id.* at 647. Yet when the district court reversed the conspiracy conviction, it failed to