*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0270p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

RONALD LOESEL, ARTHUR LOESEL, GAYLE
LOESEL, ELAINE LOESEL, VALERIAN NOWAK,
and VALERIAN NOWAK AND ALICE B. NOWAK
TRUST BY VALERIAN NOWAK,
 *Plaintiffs-Appellees,*

 No. 10-2354

 *v.*

CITY OF FRANKENMUTH,
 *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:08-cv-11131—Thomas L. Ludington, District Judge.

Argued: May 29, 2012

Decided and Filed:  August 20, 2012

Before:  MARTIN, GILMAN, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Mary Massaron Ross, PLUNKETT COONEY, Bloomfield Hills, Michigan,
for Appellant.  Andrew Kochanowski, SOMMERS SCHWARTZ, P.C., Southfield,
Michigan, for Appellees. **ON BRIEF:** Mary Massaron Ross, PLUNKETT COONEY,
Detroit, Michigan, for Appellant.  Andrew Kochanowski, Jesse Young, SOMMERS
SCHWARTZ, P.C., Southfield, Michigan, for Appellees.

_____

## OPINION
_____

 RONALD LEE GILMAN, Circuit Judge.  This appeal concerns the legality of
actions taken by the City of Frankenmuth (the City) to keep a Wal-Mart supercenter
from being built on land owned by the Loesel family in Frankenmuth Township (the
Township).  As the result of a post purchase-agreement ordinance that restricted the size

of any new buildings on the property to 65,000 square feet or less, Wal-Mart Real Estate Business Trust (Wal-Mart) terminated its conditional agreement to purchase the Loesels' land for $4 million.

The Loesels sued the City for damages, claiming that the selective zoning ordinance violated their rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. A jury agreed, awarding the Loesels $3.6 million in damages. For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A.    Factual background

Frankenmuth, "Michigan's Little Bavaria," is one of the top tourist destinations in Michigan. Despite its popularity with tourists, Frankenmuth maintains a small town atmosphere with a population of 4,838 in the City and 2,049 in the Township, according to the 2000 U.S. Census (the last Census taken before the events relevant to this case occurred). The City is famous for its Bavarian-themed stores, restaurants such as the Bavarian Inn and Zehnder's serving family-style chicken dinners, and its gift shops. Bronner's Christmas Wonderland, the world's largest year-round Christmas store, draws over two million visitors annually.

The plaintiffs, Ronald Loesel, Arthur Loesel, Gayle Loesel, Elaine Loesel, Valerian Nowak, and The Valerian Nowak and Alice B. Nowak Trust (collectively, the Loesels), are the co-owners of a 37-acre tract of land that borders Main Street just outside the Frankenmuth city limits. They inherited the property from their mother when she died in 2003. A 2003 property-tax appraisal valued the land at $95,000.

The Loesels' property has been used as farmland for nearly 100 years. Although not within the City's boundaries, the property is within the urban growth area that was established jointly by the City and the Township in 1985 to confine and guide urban growth in order to retain the character of the Frankenmuth community. The City's and the Township's growth is guided by their Joint Growth Management Plan (the Plan) that

sets forth the goals for Frankenmuth's expansion. In 1985, the first version of the Plan was drafted and, in June 2005, the second version of the Plan was formally adopted.

The two governments agreed as part of the Plan that they should "[p]romote compact residential and commercial development inside the urban limit line," which included the Loesels' property. To promote growth, the western portion of the Loesels' property along Main Street, approximately 15 acres in size, was zoned as Commercial Local Planned Unit Development (CL-PUD), with the remaining 22 acres to the east designated as Residential Planned Unit Development (R-PUD). Permitted uses for CL-PUD-zoned properties include developments that "provide principally for sale of goods and services to meet the general needs of the residents of the Frankenmuth community, including but not limited to grocery, department, drug and hardware stores, financial institutions, professional and personal service offices and transportation sale and service businesses." City of Frankenmuth, Mich., Zoning & Planning Code § 5.241.3(1) (2009).

At the time the Loesels inherited the property, the land was being leased to a tenant farmer. In 2004, however, the Loesels were approached by a real-estate broker who told them he had a client interested in purchasing their property. The Loesels met with the broker and discovered that he represented Wal-Mart. Because the western portion of the Loesels' property abuts Main Street and is commercially zoned, Wal-Mart was interested in buying the property to build a store.

In early 2005, City officials became aware that Wal-Mart was interested in purchasing and developing the Loesels' property. The district court summarized the reaction of the City Manager as follows:

> On March 29, 2005, upon learning that Plaintiffs were talking to Wal-Mart, . . . City Manager Charles Graham emailed a planner acquaintance at the Michigan Department of Transportation ("MDOT") stating that "[City Clerk] Phil Kerns has now confirmed there will be a meeting here on April 7th pertaining to the Loesel property on North Main." The next day, Graham emailed the planner at MDOT and said, "We have heard rumors that the proposed project is a Walmart which I am totally opposed to, and I think most people in Frankenmuth will be opposed to." However, Graham acknowledged that [the Loesels'] property was properly commercially zoned and that as a consequence,

absent action by [the City], [the Loesels] had a right to sell the property to Wal-Mart for a store to be built in the northern end of town.

(Brackets around "[City Clerk]" in original; all other brackets added.)

On May 26, 2005, the Loesels entered into a conditional agreement to sell 23.55 acres of their land to Wal-Mart for $2,943,750, which works out to precisely $125,000 per acre. Wal-Mart had 180 days under the agreement to determine the feasibility of its planned development of the property. "At any time prior to the end of the Feasibility Period, Wal-Mart [was permitted to], for any reason in its sole and absolute discretion, cancel [the] Agreement and receive a refund of the [$50,000] Deposit."

City Manager Graham, however, did not give up his fight against Wal-Mart, as the following excerpt from the district court's opinion explains:

> At a point after [the Loesels] had signed the agreement with Wal-Mart, Graham began to solicit information concerning other communities' efforts to exclude Wal-Mart from their towns. On June 22, 2005, in response to an email he sent requesting assistance on how to oppose the Wal-Mart, Graham was told that [the City] could[] "[a]dd a provision to the zoning ordinance that limits the size of any commercial building. That will stop them from enlarging and may stop them from beginning if they know they cannot enlarge." In the same email, Graham was advised: "Be sure to do a good internet search first because WalMart has challenged some of those provisions and won when they were poorly drafted, but lost when they weren't, if I recall correctly." Graham was further advised: "It is definitely better for citizens to fight it instead of the city and township."
>
> On July 14, 2005, Graham attended a meeting of the Frankenmuth Economic Development Corporation ("EDC"). At the meeting Graham acknowledged that he had reviewed the proposed site plan submitted by Wal-Mart's engineers, and admitted that, as shown, it appeared that the zoning allowed the proposed project. The EDC estimated that the Wal-Mart store would generate between $40,000 and $50,000 in annual [property] tax revenue for [the City], which would have added an additional two-percent to [the City's] annual property tax revenue, with total tax revenue for [all local taxing entities] amounting to between $200,000 and $250,000.
>
> . . . . On July 15, 2005, Sheila Stamiris, Executive Director of the DDA [(Frankenmuth Downtown Development Authority)], sent a

memorandum to the Frankenmuth Mayor and City Council. She advised [the] Mayor and the City Council that [the Loesels] had been offered a large sum of money by Wal-Mart for their land. She said:

> Tuesday we awkwardly discussed the proposed Walmart project. As I already suggested, we have not brought the discussion to the public agenda. If there is anything good to say about the project, we can say that we have been given a heads up by the owner and perhaps we have been given a gift of time to adequately plan for this controversial project. I feel strongly that the City should remain neutral while fact finding is completed.

Stamiris expressly advised [City officials] that the proposed store was a 104,000 square-foot super-center including sundry and drygoods, a grocery, a pharmacy, and a tire center. Stamiris identified the precise location of the proposed store. Shortly after writing the memorandum, Stamiris advised Graham and other [City] officials that other Michigan towns had not experienced problems with Wal-Mart stores. She forwarded an email from the Downtown Development Authority of DeWitt, Michigan, a town roughly the same size as [the City], that said in response to her inquiry:

> We have three Wal-Marts within a twenty mile radius. To this point we have not noticed that specifically, Wal-Mart has negatively impacted our downtown. We recently lost a dollar store, but [I] am not sure it could be contributed [sic] to the opening of a Wal-Mart. It seems that folks in this area are of the opinion that shoppers will go where they can get the best deal and Wal-Mart has good deals. We feel that the Big Box stores offering one stop shopping appeal to younger shoppers with convenience as their goal.

Stamiris also forwarded to [City officials] an Economic Impact Report that estimated the new Wal-Mart store would generate between three- and five-hundred jobs and contribute $70,000 in taxes in the first year of operation. After receiving the report, Graham again solicited an MDOT planner for help in opposing the proposed store. In an email that acknowledged that Wal-Mart itself advised that it would create three-hundred jobs paying nearly ten dollars per hour, he asked MDOT, "Do you know of any localities that have ordinances that prohibit 24 hour operation?"

On July 20, 2005, [City officials were] advised by Tom Johnston, a prominent local businessman [and co-owner of the Bavarian Mall], that an anti-Wal-Mart group called Citizens for Frankenmuth First had been

set up, and that Johnston was involved in the group as a Vice-President. Johnston had operated an IGA store for several years until it was purchased by the Kroger Company, which operates over three-thousand stores in the United States, in 2003. The Kroger is located on North Main Street, several blocks north of Genesee Street within the Bavarian Mall, which is zoned B-3, highway commercial. Previously, Greg Rummel, a member of [the City's] Planning Commission[,] helped to set up the citizens group in its initial stages, as citizens contacted him with concerns. He discontinued official participation with the group when he perceived a potential conflict of interest with his role on the Planning Commission.

(Brackets for "[a]dd" in original; all other brackets added.)

In August 2005, at the suggestion of the City's Planning Commission, the City passed Resolution No. 2005-92, a 120-day moratorium on the construction of any facility with an area of 70,000 square feet or more. This temporary respite gave City officials time to consider legislation that would stop Wal-Mart from proceeding to develop the Loesels' property, as the district court detailed:

> An individual who was known for his anti-Wal-Mart views[] transmitted to Graham and Kerns the text of a Maryland ordinance that limited retail establishments to 65,000 square feet. Later, Graham and Kerns obtained an article from the American Planning Association entitled "Practice Big Box Regulation," which explained some methods by which towns could zone away stores like Wal-Mart. On September 14, Graham sent an email to Kerns that suggested how such an ordinance could be formulated.

> In the days that followed, but before any public hearing on the issue, Graham continued to pursue "size-cap" ordinances as the means of blocking Wal-Mart. On September 14, 2005, he contacted the Institute for Local Self-Reliance, an anti-Wal-Mart website that sells books entitled, "Big Box Swindle," among others. He inquired about anti-Wal-Mart ordinances as follows:

>> I read your article on store size caps. My question is: Have any of these communities been sued for establishing these store size caps and if so what were the results? If we adopt this type of ordinance, does it have a chance of withstanding potential litigation? Our recently updated community master plan does provide a good foundation for adoption of this type of ordinance. Our City Council

is interested in pursuing this type of ordinance, but there is some hesitancy about it because of the fear of law suits.

. . . . On September 27, 2005, Graham first internally introduced the idea of an ordinance capping the size of a retail establishment. Two days later, Graham introduced [Robert] LaBelle [(an attorney retained by Citizens for Frankenmuth First)] to the Frankenmuth Ordinance Review Committee ("ORC") and invited LaBelle to attend the meeting with the ORC, scheduled for October 5, 2005.

At the time this occurred, [the City's] only economic development report concerning a Wal-Mart in Frankenmuth was the positive assessment [the City] obtained during the summer of 2005. On October 5, 2005, Graham sought an opinion from the City's insurer about liability coverage in the event of a lawsuit. On October 11, 2005, Graham forwarded to members of the ORC committee a proposed ordinance that would limit store size. The proposed ordinance was drafted by LaBelle, and his services were paid for by Citizens for Frankenmuth First. It is not known how the citizens group was funded. The zoning ordinance would establish a Neighborhood Commercial Overlay Zone, set standards and regulations within the zone, and limit the size of retail establishments to 65,000 square feet. On October 18, 2005, Wal-Mart made a presentation to [the City] indicating that it was willing to design its store to fit in architecturally with the Bavarian appearance maintained in the historic part of town.

After the first draft of the ordinance was circulated, Graham continued to communicate with LaBelle about the potential Wal-Mart store. In an email dated October 21, 2005, Graham expressed concern to LaBelle that having the ordinance apply only to the northern end of town was discriminatory and Graham expressed further concern that were the ordinance to be applied city-wide, the established, local businesses on the southern end would object to having a limitation that stopped them from building in the future. In his email to LaBelle, Graham said:

> The Planning Commission will also have to decide which of the two versions of the 65,000 square foot store ordinance they want to adopt. As our Ordinance Review Committee was reviewing the findings section at the beginning of the ordinance, we could not see how those findings justified only allowing a building of less than 65,000 square feet north of Genesee Street. We also felt that in a court of law a judge would view this approach as more even handed because it will be applicable to the entire City. Having the ordinance only apply north of Genesee is discriminatory to that area of town. That's

> why the one version of the ordinance would have to apply
> to the entire City.

Genesee Street runs east and west and roughly bisects the City. The businesses south of Genesee Street include Bronner's Christmas Wonderland, and City officials were concerned about what effect a 65,000-square-foot limitation would have on Bronner's. As the district court noted:

> In the same email to LaBelle, Graham said:
>
>> However, the Committee also recognizes that the local businesses who are in the tourist business may object to having this limitation apply to their area of town, i.e., the area south of Genesee. The example we keep hearing is, What if Cabella's wants to locate a store here? That's the reason for drafting the ordinance version that applies to the area north of Genesee. I think this version of the ordinance would be fine if we could all feel comfortable with the justification of why it would only apply to the area north of Genesee. Up to this point, I don't think we have adequate justification for restricting it to that area.
>
> Graham then created two new drafts of the ordinance, with one draft limiting the store cap size only to an area north of Genesee Street, and one draft establishing a Commercial Overlay Zone encompassing all properties within [Frankenmuth's urban growth area].
>
> . . . .
>
> . . . . Shortly before [the ordinance] was set for a vote by the Planning Commission, Graham explicitly noted that the proposed zoning ordinance should not be written to affect Bronner's:
>
>> We . . . may have a proposed project in another commercial zone such as B-3. The property where Bronner's is located is zoned B-3 and I don't want to have to tell them they can't qualify for a 70,000 square foot addition.

In addition, Graham was informed of Johnston's concern that the ordinance might hamper the ability of the Kroger located in Johnston's Bavarian Mall to expand. Because the Bavarian Mall is north of Genesee Street, the mall would be subject to the draft of the ordinance that excluded only the properties south of Genesee.

As a result of these and other concerns, Graham, with the assistance and input of others, decided to shrink the size of the area affected by the proposed ordinance even further, to include only CL-PUD-zoned properties. This meant that the only properties affected by the ordinance were the Loesels' property and a handful of much smaller parcels in its immediate vicinity. The proposed ordinance excluded the part of the town immediately south of the Loesels' property, including the Bavarian Mall and Bronner's.

This version of the ordinance was ultimately adopted on December 7, 2005 as Ordinance No. 2005-10. It established the "Commercial Local Planned Unit Development Overlay Zone (CL-PUDOZ) encompassing all CL-PUD (Commercial Local Planned Unit Development) zoning districts in the City of Frankenmuth" and required that the floor area of any retail building in the CL-PUDOZ "shall not exceed sixty-five thousand (65,000) square feet."

Wal-Mart and the Loesels, apparently unaware of the ordinance's passage, amended their purchase agreement on the same date to state that Wal-Mart would buy all 37 acres of the Loesels' property for $4 million. The amendment also provided that Wal-Mart had to put a $5,000 nonrefundable deposit into escrow.

Wal-Mart continued for the time being to move forward with the project and attended a pre-application meeting with the City and the Township on January 13, 2006. Following the meeting, the City sent a list of additional items that would be needed for Wal-Mart to proceed with the application process, such as traffic-impact and economic-impact studies and a landscaping plan that complied with storm-water drainage regulations. Wal-Mart was directed to submit these items before a second pre-application meeting was scheduled. In light of the new size-cap ordinance, however, Wal-Mart declined to continue with the approval process and never again communicated with the City about the proposal.

In a letter dated March 16, 2006, Wal-Mart informed the Loesels that it intended to terminate the purchase agreement pursuant to the "feasibility" clause. The Loesels received the $5,000 from the escrow account and Wal-Mart recovered its $50,000 deposit. A representative from Wal-Mart testified (in a deposition that was read into the

record at trial) that the agreement was terminated because Wal-Mart would not have been able to build its proposed supercenter on the Loesels' property given the 65,000-square-foot restriction.

**B.     Procedural background**

In March 2008, the Loesels filed a complaint against the City. They brought suit under 42 U.S.C. § 1983, alleging that the City's 65,000-square-foot zoning restriction violated their rights under the Equal Protection, Due Process, Privileges or Immunities, and Commerce Clauses of the U.S. Constitution. As a remedy, they sought $4 million in compensatory damages, attorney fees under 42 U.S.C. § 1988, costs, and an order declaring that the ordinance is unconstitutional.

The district court granted summary judgment for the City on all but the Loesels' equal protection claim. And even that claim, according to the court, was not viable as an "as-applied" challenge, but could be submitted to a jury as a "facial" challenge. The court ruled that to succeed on an "as-applied" challenge, the Loesels' would have had to show that the City actually applied the size-limitation ordinance to their property. Wal-Mart, however, failed to complete the application process for approval of its store, so the City never denied Wal-Mart's application for development. Because the size-limitation was never directly enforced against the Loesels, their as-applied challenge had no merit. But the district court concluded that the Loesels had raised a genuine dispute as to whether the size-limitation ordinance was invalid on its face (a "facial" challenge) because they had presented evidence demonstrating that the mere existence and threatened enforcement of the ordinance adversely affected the value of their property.

A trial was held on the Loesels' facial equal protection claim in February and March 2010. The City moved for judgment as a matter of law following the close of the Loesels' case-in-chief and again at the close of its own proof. Both times the district court declined to rule, taking the matter "under advisement pending the determination of the jury." The jury then returned a verdict for the Loesels and awarded them $3.6 million in damages.

Shortly thereafter, the City filed a renewed motion for judgment as a matter of law or, in the alternative, for a new trial or remittitur, which the district court denied in September 2010. The court then granted in part and denied in part the Loesels' motion for entry of judgment and assessment of attorney fees, interest, and costs. In its order, the court determined that the Loesels were entitled to the declaratory relief requested—that the challenged zoning ordinance be declared unconstitutional—and to prejudgment interest, but denied their request for prefiling interests and costs. *Loesel v. City of Frankenmuth*, 743 F. Supp. 2d 619, 641 (E.D. Mich. 2010) ("The Court is persuaded by Plaintiffs' arguments that declaratory relief is proper under the circumstances of this case."). The court also determined that an evidentiary hearing was necessary before it could rule on the Loesels' request for attorney fees. Before that hearing occurred, and before judgment was entered, the City filed a timely notice of appeal from the court's September 27, 2010 Order.

## II. ANALYSIS

### A.     Judgment as a matter of law

The City claims that the district court erred in denying its renewed motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. We review a district court's denial of a Rule 50(b) motion de novo. *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007). "The motion may be granted only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Id.* (internal quotation marks omitted).

Here, the City argues that there was insufficient evidence for the jury to reasonably conclude that the 65,000-square-foot size restriction violated the Equal Protection Clause. "The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681-82

(6th Cir. 2011) (holding that the state officials' motion to dismiss should have been granted on the basis of qualified immunity where the plaintiffs alleged that the officials violated their right to equal protection by treating female farm owners differently than similarly situated male farm owners).

In this case, the Loesels pursued their equal protection claim under the "class-of-one" theory recognized by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam) (holding that the Olechs sufficiently stated an equal protection claim where they alleged that, as a condition of being connected to the municipal water supply, the village demanded a 33-foot easement from the Olechs but required an easement of only 15 feet from similarly situated neighbors). Class-of-one claims are generally viewed skeptically because such claims have the potential to turn into an exercise in which juries are second-guessing the legislative process:

> In the wake of *Olech*, the lower courts have struggled to define the contours of class-of-one cases. All have recognized that, unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors. It is always possible for persons aggrieved by government action to allege, and almost always possible to produce evidence, that they were treated differently from others, with regard to everything from zoning to licensing to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review. This would constitute the federal courts as general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system.

*Jennings v. City of Stillwater*, 383 F.3d 1199, 1210-11 (10th Cir. 2004) (footnote omitted).

That is why a plaintiff must overcome a "heavy burden" to prevail based on the class-of-one theory. *See TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio*, 430 F.3d 783, 791 (6th Cir. 2005) (affirming the district court's conclusion that the

plaintiff-hospitals "had not carried [their] heavy burden" of proving an equal protection violation under the class-of-one theory where the plaintiffs alleged that awarding county tax funds exclusively to the local university hospital and not the plaintiff-hospitals was discriminatory). The Loesels must show that they were treated differently than those similarly situated in all material respects. *See Rondigo*, 641 F.3d at 682. In addition, they

> must show that the adverse treatment they experienced was so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational. This showing is made either by negativing every conceivable reason for the government's actions or by demonstrating that the actions were motivated by animus or ill-will.

*Id.* (citations and internal quotation marks omitted).

The City argues that it is entitled to judgment as a matter of law because the Loesels failed to show that (1) their property was similarly situated to other properties that were treated differently under the zoning ordinance, (2) the ordinance lacked a rational basis, or (3) the ordinance was passed because of any animosity against the Loesels. Each of these arguments is addressed in turn below.

### 1.    *Similarly situated*

The Loesels have the burden of demonstrating that they were treated differently than other property owners who were similarly situated in *all material respects*. *See TriHealth*, 430 F.3d at 790 ("Materiality is an integral element of the rational basis inquiry. . . . [D]isparate treatment of persons is reasonably justified if they are dissimilar in some material respect."); *see also Schellenberg v. Twp. of Bingham*, 436 F. App'x 587, 591 (6th Cir. 2011) (holding that "plaintiffs must allege that they and other individuals who were treated differently were similarly situated in all material respects" (brackets and internal quotation marks omitted)).

"In determining whether individuals are 'similarly situated,' a court should 'not demand exact correlation, but should instead seek relevant similarity.'" *Bench Billboard*

*v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012) (quoting *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000) (citation omitted)). "[M]ateriality cannot be evaluated in a vacuum." *TriHealth*, 430 F.3d at 790. "Inevitably, the degree to which others are viewed as similarly situated depends substantially on the facts and context of the case." *Jennings*, 383 F.3d at 1214. Furthermore, "determining whether individuals are similarly situated is generally a factual issue for the jury." *Eggleston v. Bieluch*, 203 F. App'x 257, 264 (11th Cir. 2006).

The Loesels asserted at trial that the two local properties containing the area's largest retail establishments—the Bavarian Mall and Bronner's—were similarly situated to their property. But the City contends that, as a matter of law, there are material differences between the Loesels' property and the other two properties. The district court disagreed with the City and ruled that sufficient evidence existed for a jury to reasonably conclude that the Bavarian Mall and Bronner's were similarly situated to the store that Wal-Mart proposed to build on the Loesels' property:

> [The City] contends that the Court erred in determining that Plaintiffs can maintain a "class of one" equal protection claim because Bronner's and Kroger [(i.e., the Bavarian Mall)] are not similarly situated to Plaintiffs in relevant, material aspects. [The City] contend[s] that Plaintiffs are not similarly situated to Bronner's and Kroger because the stores sell different products than Wal-Mart and because the properties are zoned differently. [The City] has not explained how any differences between the products to be sold by Wal-Mart and those sold by either Bronner's or Kroger is relevant and material to the enactment of a size-cap and the equal protection analysis. Additionally, as the Court explained in its order, the fact that the properties are zoned differently and that the requirements and goals of the different classifications are not identical does not mean that the properties cannot be similarly situated. [The City] has not explained how any differences in requirements and goals are material to the analysis.

*Loesel v. City of Frankenmuth*, No. 08-11131-BC, 2009 WL 1449049, at *2 (E.D. Mich. May 22, 2009) (unpublished opinion).

The district court's analysis implies that the proper comparison is between the stores on the properties (or, in the case of the Loesels, the store proposed for their

property), rather than between the property owners or the properties themselves. And at times the court conflated the Loesels with Wal-Mart. The relevant question, however, should be framed in terms of the properties and their owners, not in terms of the stores located on those properties. In other words, the proper comparison is not between the supercenter that Wal-Mart wanted to develop, on the one hand, and the Bavarian Mall and Bronner's on the other, but between the Loesels' property and the properties on which the Bavarian Mall and Bronner's sit. *See Taylor Acquisitions, L.L.C., v. City of Taylor*, 313 F. App'x 826, 838 (6th Cir. 2009) (holding that the plaintiff had to show in its class-of-one equal protection claim that the government officials had personal animus against the plaintiff, not against the development that the plaintiff was proposing). Despite this weakness in the district court's analysis, much of its reasoning can be translated into a proper comparison between the various properties.

The first property that the Loesels assert is similarly situated to theirs is the parcel on which the Bavarian Mall is located. This strip mall is the second-largest commercial development in Frankenmuth, located on the east side of Main Street just south of the Loesels' property. The properties are in fact so close that only two small parcels of land separate them. Originally constructed in 1973, the Bavarian Mall has retail space measuring 104,000 square feet. Its tenants include a Kroger grocery store and a gas station.

Two brothers, Dave and Tom Johnston, own a controlling interest in the Bavarian Mall. Dave was a member of the Downtown Development Authority (DDA) in 2005, and Tom had previously been on the City Council. Tom was the person who filed the articles of incorporation for Citizens for Frankenmuth First in August 2005.

The 45-acre parcel on which Bronner's Christmas Wonderland sits is the other property that the Loesels assert is similarly situated to theirs. Located at the southern end of Main Street, two miles south of the Loesels' property, the parcel contains a 400,000 square-foot retail store. The owner of Bronner's is the Bronner family. Wayne Bronner, president and chief executive officer of Bronner's, was chairman of the DDA board of directors in 2005.

According to the City, the district court should have ruled as a matter of law that the Loesels' property is not similarly situated to the Bavarian Mall and Bronner's properties because of three alleged distinctions between them. The first alleged difference concerns the zoning classification: both the Bavarian Mall and Bronner's are located on B-3-zoned properties, whereas the portion of the Loesels' parcel affected by the ordinance is zoned CL-PUD.

The Loesels' respond by pointing out that this distinction is not a material one. Indeed, even City Manager Graham conceded that there was "no difference in terms of how the zoning treated the CL-PUD and the B-3" and that "essentially the same regulations" apply to both zones. He also acknowledged that, had the Loesels' property been inside the City limits in 1985 when the zones were first applied, "It would probably have been designated as B-3." The jury could therefore have reasonably concluded that the difference in "labels" for these commercially zoned properties is not material.

This leads to the City's second alleged distinction: that the Loesels' property differs from the Bavarian Mall and Bronner's properties because the Loesels' property is vacant land, whereas the properties containing the Bavarian Mall and Bronner's were already developed. The City's argument would have more force had it not previously designated the Loesels' property as CL-PUD. As part of the City's Plan, however, the promotion of commercial development is encouraged on the CL-PUD properties. Accordingly, the jury could have reasonably concluded that the developed/undeveloped distinction is not material.

The City's last alleged difference between the Loesels' property and the other two properties that it contends is material relates to their traffic capacities. Main Street is five lanes wide at the entrances to both the Bavarian Mall and Bronner's, but narrows to three lanes at the Loesels' property. The City contends that a three-lane road does not provide adequate traffic capacity for a store with over 65,000 square feet of sales space. Traffic-capacity considerations, however, are typically deferred until the development-application process. To prevent a development from being built where traffic capacity is inadequate, the City did not have to enact a size-restriction ordinance; it could have

simply rejected the application on the basis of inadequate traffic capacity. Moreover, Main Street in front of the Loesels' property would have the same traffic capacity as at the other two locations simply by extending the extra two lanes the length of the property. These facts lessen the importance of the difference in traffic capacity to the point where the jury could have reasonably concluded that it is not material.

In sum, there is a genuine dispute of material fact as to whether the three properties are similarly situated. This means that the district court did not err in denying the City's renewed motion for judgment as a matter of law on this issue.

### 2.       *Rational basis*

The City next contends that it is entitled to judgment as a matter of law on the issue of whether the zoning ordinance had a rational basis. Under rational basis review, the defendant "has no obligation to produce evidence to sustain the rationality of its actions; its choice is presumptively valid and may be based on rational speculation unsupported by evidence or empirical data." *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio*, 430 F.3d 783, 790 (6th Cir. 2005). The burden instead falls on the Loesels to "demonstrate that a government action lacks a rational basis . . . either by negativing every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Warren v. City of Athens, Ohio*, 411 F.3d 697, 711 (6th Cir. 2005) (brackets and internal quotation marks omitted).

### a.       *No-conceivable-basis theory*

The City contends that the Loesels did not present evidence sufficient to refute every possible nondiscriminatory reason for enacting the 65,000 square-foot size restriction. It argues that the testimony of its municipal-land-use expert Donald Wortman demonstrated that a rational basis existed for applying the size limit to only CL-PUD-zoned properties. Wortman testified that several characteristics of the Loesels' property made it unsuitable for a large big-box retail store, including the parcel's inadequate depth (the CL-PUD portion of the Loesels' property is only 660 feet deep as

opposed to the typical 1,000 feet or more of depth typical of large retail developments), its close vicinity to residential property, its inadequate traffic capacity and space for parking, and its potential storm-water retention issues.

Wortman then identified about one dozen parcels of land within Frankenmuth's urban growth area that he believed were better suited for the development of a big-box store than was the Loesels' property. He also explained that Wal-Mart's planned supercenter would attract more than Frankenmuth residents because the stores generally require a population of at least 30,000, whereas the City and Township total less than 7,000 residents. This would, according to Wortman, make a Walmart supercenter more appropriate for CT-PUD-zoned properties in the southern end of the urban growth area, which were designated to serve visitors, than the local-resident-oriented CL-PUD district in the northern end. He further reasoned that the ordinance bolstered the City's desire to maintain "a compact commercial core" in the downtown city center that is "pedestrian friendly [and] a benefit to the residents."

In Wortman's professional opinion, the City reasonably decided to apply the size limit to only CL-PUD-zoned properties because there were already properties in the B-3 zone—specifically the Bavarian Mall and Bronner's—that were over the 65,000-square-foot size limit. He explained that there would be negative consequences to applying a size limit to a building that already exceeded the limit. One such consequence would be that an existing building exceeding the new size limit would be considered "non-conforming" and, although the structure could remain as is, the property owner would be unable to enlarge the existing structure without receiving a variance from the zoning board. In addition, "financial institutions are reluctant to extend loans or mortgages to structures that are non-conforming," in part because if more than 50% of the structure were destroyed, the new zoning ordinance would not permit the structure to be rebuilt.

The Loesels respond by arguing that the jury correctly rejected Wortman's opinions because his testimony was undercut on cross-examination and by the testimony of City Manager Graham. Wortman conceded, for example, that he had no idea whether the parcels that he identified in the southern end of the City were available for sale, what

the current uses of those properties were, or whether any of the parcels contained undeveloped wetlands or had appropriate road access.

Moreover, City Manager Graham contradicted Wortman's opinion that the Plan called for growth in the southern end of Frankenmuth rather than in the northern end. Graham testified that the Plan made no distinction between the two areas of the City. Language directly from the Plan supports Graham's view:

> As demand for additional local commercial businesses becomes evident, additional local commercial establishments should be located in the northern end of the city, north of the Bavarian Mall area along Main Street in Section 23.

In sum, a genuine dispute exists as to whether the ordinance lacked a rational basis. The jury could therefore have rejected Wortman's testimony in finding for the Loesels on this issue.

### b.        *Animus or ill will*

Finally, the City contends that the district court should have granted the City judgment as a matter of law on the issue of whether animus or ill will against the Loesels motivated the enactment of the 65,000-square-foot size restriction. The district court determined that a reasonable jury could conclude that the City harbored animus against the Loesels because no invitations or notices were sent to the Loesels concerning the city council meeting at which the proposed size-limitation ordinance was discussed. But the fact that the City was not cognizant of or proactively seeking the Loesels' opinions is a far cry from harboring animus or ill will. Animus is defined as "ill will, antagonism, or hostility usually controlled but deep-seated and sometimes virulent." *Webster's Third New International Dictionary, Unabridged* (2002). Similarly, ill will is defined as an "unfriendly feeling: animosity, hostility." *Id.* These definitions indicate that a showing of animus or ill will (hereinafter collectively referred to as "animus") requires more than simply failing to invite the Loesels to a meeting.

The Loesels attempt to bolster the district court's determination on this issue by claiming that Sheila Stamiris, Executive Director of the DDA, harbored feelings of envy

because, when Stamiris first heard rumors of the potential sale of Loesels' property to Wal-Mart, she informed City officials in a memorandum that the Loesels were selling their land for a "great deal of money." But Stamiris never indicated in the memorandum that the amount of money bothered her, nor did she say anything negative about the Loesels in the document. She even mentioned in the memorandum that she was grateful that the City had "been given the 'heads up' by the [Loesels]" about the proposed sale. Furthermore, her statement about the money involved in the deal was true: by that date, the Loesels had been offered nearly $3 million by Wal-Mart. Stamiris's isolated remark is therefore insufficient to prove that Stamiris—much less the City officials who actually enacted the ordinance—was motivated by any animus against the Loesels.

Although the Loesels presented abundant evidence showing that certain City officials, such as City Manager Graham, strongly opposed having a Wal-Mart supercenter in Frankenmuth, the animus had to be directed against the Loesels to be relevant to their claim. *See Taylor Acquisitions, L.L.C., v. City of Taylor*, 313 F. App'x 826, 838 (6th Cir. 2009) (holding that the plaintiff had to show in its class-of-one equal protection claim that government officials expressed animus against the plaintiff, not against the development it was proposing); *see also Ziss Bros. Constr. Co. v. City of Independence, Ohio*, 439 F. App'x 467, 479 (6th Cir. 2011) (concluding that the plaintiff failed to allege an equal protection violation based on animus where the plaintiff alleged that the animus of the defendant-city was directed at the plaintiff's proposed development plan and not at the plaintiff itself); *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) (holding that a class-of-one claim may be established by showing that there "is a totally illegitimate animus toward the *plaintiff* by the defendant" (emphasis added) (internal quotation marks omitted)). The district court, therefore, should have granted the City's motion for judgment as a matter of law on the animus theory of liability.

This leaves us with the question of whether the district court's error requires that we remand the case for a new trial. Before deliberations, the jury was instructed that it could find the City liable under either the no-conceivable-basis or the animus theory of

liability.  The jury returned a general verdict form answering "Yes" to the following question of liability:  "Did the plaintiff[s] prove their equal protection claim by a preponderance of the evidence?"  But as determined above, only the no-conceivable-basis theory was properly submitted to the jury.  Because nothing on the verdict form indicated which theory formed the basis for the jury's decision, the question is whether we may presume that the jury found for the Loesels' under the factually sufficient no-conceivable-basis theory or whether we must vacate the verdict and remand for a new trial.

If this were a criminal case, we would follow the Supreme Court's decision in *Griffin v. United States*, 502 U.S. 46 (1991), which held that "'in the absence of anything in the record to show the contrary, the presumption of law is that' . . . [the] jurors convicted [the defendant] on the factually sufficient theory."  *United States v. Henning*, 286 F.3d 914, 921-22 (6th Cir. 2002) (emphasis omitted) (quoting *Griffin*, 502 U.S. at 50).  The *Henning* court reasoned that "[w]hen faced with alternative theories of liability, jurors can rely on their own intelligence and experience to save them from relying upon a factually inadequate theory."  *Id.* at 921.

Many circuits have extended the holding in *Griffin* to civil cases.  *See, e.g.*, *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849-50 (Fed. Cir. 2010) (applying the *Griffin* rule in the civil context); *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 126 (5th Cir. 1992) (same); *Sandberg v. Va. Bankshares, Inc.*, 891 F.2d 1112, 1122 (4th Cir. 1989) (same), *rev'd on other grounds*, 501 U.S. 1083 (1991); *McCord v. Maguire*, 873 F.2d 1271, 1274 (9th Cir. 1989) (same).  But our circuit has declined to apply *Griffin* in civil cases tried before a jury.  *See Virtual Maint., Inc. v. Prime Computer, Inc.*, 11 F.3d 660, 667 (6th Cir. 1993).

In *Virtual Maintenance*, the plaintiff (VM) presented to the jury three alternative theories of liability to support its claim that "product bundling" by the defendant Prime Computer violated the Sherman Act.  The jury returned a verdict in favor of VM.  On appeal, however, this court determined that VM had failed to produce evidence sufficient to find Prime Computer liable on two of the three theories and, therefore, Prime

Computer should have been granted judgment as a matter of law on those theories. But the court also concluded that evidence presented on the third theory was sufficient to support the jury's verdict. Nonetheless, the court determined that it could not let the jury's verdict stand. It ruled that, despite the existence of a viable theory of liability, "[b]ecause the general jury verdict in the first trial provides no indication of the jury's reliance on [the factually sufficient] theory in support of the original verdict, we are obligated to reverse the verdict and remand for a new trial." *Id.*

VM then petitioned for rehearing, specifically requesting that this court follow the presumption outlined in *Griffin* (which had been decided by the Supreme Court in the same year that *Virtual Maintenance* was heard) and allow the verdict to stand. But the court denied VM's request, holding that "*Griffin*, a criminal case, does not alter the longstanding civil general verdict rule, a principle to which this circuit has consistently adhered." *Virtual Maintenance*, 11 F.3d at 667 (citation omitted); *but see Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 472 (6th Cir. 2002) (applying the *Griffin* rule in a civil case where the factfinder was the district court rather than a jury).

Because *Virtual Mainenance* has not been overturned by an en banc opinion of this court or by a Supreme Court decision, we are bound by it. *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) (noting that "[a] panel of this Court cannot overrule the decision of another panel . . . unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision"). We therefore must vacate the judgment for the Loesels and remand this case for a new trial. Consequently, we need not reach the City's alternative arguments that it is entitled to a new trial because of improper jury instructions and erroneous evidentiary rulings.

**B.    Damages**

Although we also need not reach the issue of whether the district court erred in denying the City's motion for a remittitur, we believe that the potential for reversible error on the issue of damages will be reduced by offering some guidance to the district court. The damages awarded by the jury, $3.6 million, strikes us as excessive, in large

part because the verdict itself renders the zoning ordinance unconstitutional and unenforceable. Had the jury verdict been upheld, the Loesels would have retained their property unencumbered by the zoning ordinance and been awarded $3.6 million, which is 90% of the full purchase price from Wal-Mart. This outcome would have let the Loesels recover twice, an impermissible result. *See Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980) ("It also goes without saying that the courts can and should preclude double recovery by an individual.").

In the event that the case is tried again, the jury should be instructed that the proper damages award in this case is the amount that the Loesels would have received from Wal-Mart had the ordinance never been enacted minus the property's value unencumbered by the zoning ordinance. Although the jury was instructed by the district court to "award [the Loesels] such a sum as you find by the preponderance of the evidence will fairly and justly compensate them for actual losses you find they have suffered as a direct result of the defendant's conduct," we believe that this instruction was overly vague. While deliberating, the jury sent a note to the district court asking: "Is there any possibility of transferring the land to the City/township if a monetary award of 4 million dollars is awarded to the Loesels?" This suggests that the jury struggled with how to award damages without giving the Loesels a windfall. That is why, if tried again by a jury, we recommend that the jury instructions on damages include a specific formula to aid the jury in calculating damages.

## III. CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.