IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 1, 2024 Session

ELIJAH SHAW ET AL. v. METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY

Appeal from the Chancery Court for Davidson County
No. 17-1299-II        Anne C. Martin, Chancellor

_____

No. M2023-01568-COA-R3-CV

_____

This is an equal protection challenge to a city ordinance that restricts customer visits to some home-based businesses but not others, which the plaintiffs contend are similarly situated in all material respects in relation to the purpose of the restrictions. After the parties filed cross-motions for summary judgment, the trial court held that the restrictions were constitutional because they were rationally related to the city's interest in preserving the residential nature of neighborhoods. Thus, the court granted Metro's motion and denied the plaintiffs' motion. The plaintiffs appeal, contending that the trial court reached the incorrect conclusion because the plaintiffs presented evidence that their home-based businesses have no greater impact on the residential nature of neighborhoods than the exempt home-based businesses. We agree with the plaintiffs. Thus, we reverse the judgment of the trial court and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Reversed and Remanded**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and JEFFREY USMAN, JJ., joined.

Justin D. Owen, Wencong Fa, and Ben F. Stormes, Nashville, Tennessee; Paul V. Avelar, *pro hac vice*, Phoenix, Arizona; and Keith Neely, *pro hac vice*, Arlington, Virginia, for the appellants, Elijah Shaw and Patricia Raynor.

Wallace W. Dietz, Lora Barkenbus Fox, and Catherine Jane Pham, Nashville, Tennessee, for the appellee, Metropolitan Government of Nashville and Davidson County, Tennessee.

# OPINION

## FACTS AND PROCEDURAL HISTORY

Elijah Shaw lives in a house he owns on a residential street in the East Nashville area of Nashville, Tennessee. In 2005, Mr. Shaw, a professional record producer, built a soundproof recording studio in his garage so he could work from home. Mr. Shaw often had more than one person visit his studio, such as when he was recording a band. Mr. Shaw's customers often booked sessions on the weekends, and the recording sessions often went past 7:00 p.m. But Mr. Shaw's customers parked in his driveway, and he never received a complaint from his neighbors.

Patricia Raynor lives in a house she owns on a residential street in the Donelson area of Nashville, Tennessee. Ms. Raynor's house is at the intersection of a cul-de-sac and a busy two-lane road. In 2011, Ms. Raynor, a hairstylist and cosmetologist, built a single-chair hair salon in her garage so she could work from home. The salon entrance was behind Ms. Raynor's house at the end of her driveway, and the salon entrance was visible from the side street but not the main road. Ms. Raynor served her customers by appointment only between the hours of 9:00 a.m. and 7:00 p.m., Tuesday through Friday. She usually served only one customer at a time, but she occasionally had more. Ms. Raynor's customers parked in her driveway, and Ms. Raynor never received a complaint from her neighbors.

The Code of the Metropolitan Government of Nashville and Davidson County ("the Metro Code") classified Mr. Shaw and Ms. Raynor's businesses as "home occupations" ("Home Occupations"). Home Occupations, as defined by the ordinance, include any "occupation, service, profession or enterprise carried on by a resident member of a family within a dwelling unit." *See* Metro Code § 17.04.060. But unbeknownst to Mr. Shaw and Ms. Raynor, when they started working from home, the Metro Code prohibited customer visits to home occupations.

But not all owner-occupied home-based businesses were subject to the customer prohibition. In particular, the prohibition did not apply to owner-occupied short-term rental properties ("STRPs"), home-based daycares, historic-home event venues,[1] and businesses on residential property rezoned as an "SP district."[2]

---

[1] The Metro Code refers to a historic-home event venues as a "historic home event," which "means the hosting of events such as, but not limited to, weddings or parties for pay in a private home which has been judged to be historically significant by the historical commission."

[2] An "SP district" is a specific plan district, defined as "an alternative zoning process that may permit any land uses, mixture of land uses, and alternative development standards, of an individual property or larger area, to achieve consistency with the general plan." Metro Code § 17.40.105.

In 2013, the Nashville Codes Department received an anonymous complaint about Ms. Raynor's hair salon. The complaint was closed after Ms. Raynor agreed to close her shop. And in 2015, the codes department received an anonymous complaint about Mr. Shaw's recording studio. That complaint was closed after Mr. Shaw agreed not to have customer visits.

*Initial Complaint and First Appeal*

In December 2017, Mr. Shaw and Ms. Raynor (collectively, "Plaintiffs" or "Homeowners") commenced this action by filing a complaint against the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro"), to challenge the constitutionality of the customer prohibition. Plaintiffs asserted that the prohibition violated their rights to substantive due process and equal protection under the Tennessee Constitution.

After conducting discovery, the parties filed cross-motions for summary judgment. The trial court granted summary judgment to Metro on the ground that the customer prohibition had "a rational relationship to the public safety, health, morals, comfort, and welfare of the people of Nashville." Plaintiffs then filed an appeal with this court. *See Shaw v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2019-01926-COA-R3-CV, 2021 WL 515887 (Tenn. Ct. App. Feb. 11, 2021), *vacated,* 651 S.W.3d 907 (Tenn. 2022). But while that appeal was pending, Metro amended the Home Occupation ordinance, § 17.16.250(D) of the Metro Code, to permit limited customer visits to certain home occupation businesses.

As amended, Section 17.16.250(D) provides:

D. Home Occupation. A home occupation shall be considered an accessory use to a residence subject to the following:

.   .   .

3. Customer Visits

   a. Customer visits must occur by scheduled appointment and only between the hours of 8:00 a.m. and 7:00 p.m., Monday through Saturday.

   b. Customer visits shall be limited to no more than three visits per hour and a maximum of six total visits per day.

   c. The permit holder shall maintain and make available to the codes department a log or register of customer appointments for each calendar year.

.   .   .

5. Activities

          .       .       .

b. The following are permitted as home occupations that are allowed customer visits under subsection D.3:

    i. Personal instruction, defined for the purposes of this section as services for training individuals or groups in academics, arts, fitness, personal defense, crafts, or other subjects of a similar nature;

    ii. General office, defined for the purposes of this section as provision of executive, management, administrative, or professional services, but not involving medical services;

    iii. Personal care services, defined for the purposes of this section as spa services and beauty and barber care. Personal care services do not extend to the care of or services for animals;

    iv. Multimedia production, defined for the purposes of this section as staging and recording of video or audio productions that occur indoors and do not require sound to leave the premises; and

    v. Artisan manufacturing, defined for the purposes of this section as the shared or individual use of hand tools, mechanical tools, and electronic tools for the manufacture of finished products or parts as well as the incidental storage, sales, and distribution of such products within the limitations of this section.

Metro Code § 17.16.250(D).

As with the customer prohibition, the new restrictions ("the Customer Visit Restrictions") did not apply to STRPs, home-based daycares, historic-home event venues, or residence-based businesses on properties rezoned as "SP" districts (collectively, "the Exempt Businesses").

In the first appeal, we held that the case was no longer justiciable because the customer prohibition had been repealed. *Shaw*, 2021 WL 515887, at *7. Plaintiffs were then granted permission to appeal to the Tennessee Supreme Court. *See Shaw v. Metro. Gov't of Nashville & Davidson Cnty.*, 651 S.W.3d 907, 911 (Tenn. 2022). The Supreme

Court ultimately vacated the judgments of this court and the trial court and remanded the case to the trial court to permit the parties to amend their pleadings. *Id*. at 918.

*Amended Complaint*

In November 2022, Plaintiffs amended their complaint to challenge the constitutionality of the new Customer Visit Restrictions. This time, Plaintiffs claimed that the Customer Visit Restrictions violated only their right to equal protection. Plaintiffs asserted that Metro had no rational basis that was germane to the purpose of the law for distinguishing between Plaintiffs' businesses and the Exempt Businesses. Metro answered the complaint and denied that the Customer Visit Restrictions were unconstitutional.

After conducting additional discovery, the parties again filed cross-motions for summary judgment. Metro argued that the Customer Visit Restrictions did not violate the Tennessee Constitution's guarantee of equal protection because the Visit Restrictions were "rationally related to a legitimate governmental purpose." In particular, Metro asserted that the Visit Restrictions were justified by Metro's "interests in preserving neighborhoods, commercial developments, and avoiding traffic and congestion." For their part, Plaintiffs neither conceded nor contested whether there were rational reasons for imposing the Customer Visit Restrictions. Instead, Plaintiffs argued that there was no rational reason that was relevant to the purpose of the law for distinguishing between their businesses and the Exempt Businesses. In support, Plaintiffs produced evidence that their businesses had no more of an impact on the residential character of neighborhoods than the Exempt Businesses. Metro did not dispute this.

*Final Judgment*

After a hearing in September 2023, the trial court granted Metro's motion for summary judgment and denied Plaintiffs'. The trial court reasoned in part:

> Plaintiffs contend that there is no real and substantial difference between them and the "privileged" home-based businesses that are not subject to the Client Visit Restrictions, pointing to owner-occupied STRPs, daycares, historic home events, and SPs. Plaintiffs contend that Metro's decision to regulate Plaintiffs more than these businesses despite having the same or less effect on their neighborhoods violates Plaintiffs' equal protection rights. However, the fact that the Metro Code selectively exempts a few categories of businesses from the Client Visit Restrictions, or that some real properties have been rezoned as SP so they could serve the public, is not a basis to invalidate the law. . . .
>
> .     .     .
>
> The Client Visit Restrictions have a rational relationship to the reasons Metro has given for its imposition. Metro Council members and

- 5 -

citizens have expressed genuine concern about the commercialization of their neighborhoods and the need to put guardrails in place if customers were allowed to visit home-businesses. Limited exceptions to the Client Visit Restrictions exist in the Metro Code for daycares and historic home events. STRPs are a more problematic exception and the Court does not dismiss their interference with the residential nature of Nashville's residential neighborhoods. The Metro Council and Metro government generally are clearly grappling with that issue, which is not before the Court today. Just because they are allowed, however, does not invalidate the logic behind the Client Visit Restrictions or persuade the Court that they are arbitrary or otherwise unreasonable.

(Citation modified).

This appeal followed.

## ISSUES

Plaintiffs raise three issues on appeal, which we consolidate and restate as whether Metro had a rational basis for imposing the Customer Visit Restrictions on Plaintiffs' businesses but not the Exempt Businesses.[3]

## STANDARD OF REVIEW

This court "review[s] a trial court's decision on a motion for summary judgment de novo, with no presumption of correctness." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). In other words, we must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *See id.*

---

[3] Plaintiffs state the issues as follows:

(1)     Whether it was error to grant summary judgment to Metro on the Plaintiffs' Tennessee Constitution equal protection challenge to the "keep and turn over a customer register" requirement.

(2)     Whether it was error to grant summary judgment to Metro on the Plaintiffs' Tennessee Constitution equal protection challenge to the "three-per-hour and six-per-day" customer visit limits.

(3)     Whether it error to grant summary judgment to Metro on the Plaintiffs' Tennessee Constitution equal protection challenge to the "customer visit hours and days" restriction.

Under Rule 56, "A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Tenn. R. Civ. P. 56.02. "[W]hen the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. "[T]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04.

## ANALYSIS

"Virtually all laws create distinctions between persons or groups." *Metro. Gov't of Nashville & Davidson Cnty. v. Lee*, No. M2023-01678-COA-R3-CV, 2025 WL 1218089, at *16 (Tenn. Ct. App. Apr. 28, 2025) (quoting Jeffrey M. Shaman, *The Equal Protection Clause*, 3 Encyclopedia of the American Judicial System: Studies of the Principal Institutions and Processes of Law 1038 (ed. Robert Joseph Janosik 1987)). But Article I, Section 8 and Article XI, Section 8 of the Tennessee Constitution guarantee citizens equal protection under the law. *Riggs v. Burson*, 941 S.W.2d 44, 52 (Tenn. 1997). This guarantee requires laws to treat "similarly situated" persons the same. *Gallaher v. Elam*, 104 S.W.3d 455, 461 (Tenn. 2003). Conversely, laws may treat differently situated persons differently. *Posey v. City of Memphis*, 164 S.W.3d 575, 579 (Tenn. Ct. App. 2004).

Thus, when a plaintiff alleges that a law violates his or her right to equal protection, "[t]he threshold inquiry is whether the classes of persons at issue are similarly situated; if not, then there is no basis for finding a violation." *City of Memphis v. Hargett*, 414 S.W.3d 88, 110 (Tenn. 2013). If the classes of persons are similarly situated, the court must then determine whether the government had a sufficient reason to treat the classes differently. *See Dr. Pepper Pepsi-Cola Bottling Co. of Dyersburg, LLC v. Farr*, 393 S.W.3d 201, 209 (Tenn. Ct. App. 2011); *Posey*, 164 S.W.3d at 579.

"[D]epending on the nature of the right asserted or a class of persons affected," our courts examine the law using one of three standards: (1) strict scrutiny; (2) heightened scrutiny; or (3) reduced scrutiny, a.k.a., "the rational basis test." *Riggs*, 941 S.W.2d at 52. "Strict scrutiny applies when the classification (1) disadvantages a suspect class or (2) "interferes with the exercise of a fundamental right." *Gallaher*, 104 S.W.3d at 460 (citation omitted). "Heightened scrutiny applies only to legislative classifications involving a quasi-suspect class, such as gender or illegitimacy." *Id*. at 461 (citation omitted). And reduced scrutiny applies to all other equal protection inquiries. *Hughes v. Tennessee Bd. of Prob. & Parole*, 514 S.W.3d 707, 716 (Tenn. 2017). The parties to this action agree that the

reduced scrutiny, a.k.a., "the rational basis test," is the appropriate standard. *See Riggs*, 941 S.W.2d at 52.

Here, Plaintiffs contend that their businesses are similarly situated to the Exempt Businesses and that the Metro Code treats Plaintiffs' businesses differently from the Exempt Businesses with respect to customer visits. Plaintiffs also contend that the Customer Visit Restrictions infringe on three of their fundamental rights: (1) the right to own, use, and enjoy property; (2) the right to earn a livelihood; and (3) the right to privacy. But Plaintiffs contend they are entitled to summary judgment even under the reduced scrutiny, rational basis standard.

For its part, Metro appears to dispute whether Plaintiffs' businesses are similarly situated to the Exempt Businesses. Regardless, Metro contends that it wins under the reduced scrutiny standard because the Customer Visit Restrictions have a rational relationship to a legitimate governmental interest. But as an initial matter, Metro asserts that the Customer Visit Restrictions allow Plaintiffs to "do much of what they are requesting."

## I. METRO'S INTERPRETATION OF § 17.16.250(D)

Metro argues that the Customer Visit Restrictions allow Plaintiffs to "do much of what they are requesting" because, according to Metro, the Customer Visit Restrictions do not prevent Plaintiffs from having multiple persons visit their businesses during a single "customer visit." Metro does not explain what relevance this has to Plaintiffs' equal protection claim, but we construe Metro's argument as going to whether the three-per-hour and six-per-day restrictions harm Plaintiffs.

Metro Code § 17.16.250(D) restricts "customer visits" to Plaintiffs' businesses to "no more than three visits per hour and a maximum of six total visits per day." The Metro Code does not define "customer visits," but Metro interprets the phrase as allowing "more than one customer [to] be present at a single customer visit." Metro's interpretation appears to be based solely on the language in § 17.16.250(D)(5)(b)(i), which allows customer visits to home-based businesses that provide "personal instruction." "Personal instruction" is defined as "services for training individuals **or groups** in academics, arts, fitness, personal defense, crafts, or other subjects of a similar nature." *Id*. (Emphasis added).[4]

---

[4] Plaintiffs respond to Metro's interpretation of the Customer Visit Restrictions in their Reply Brief on appeal, which reads in pertinent part:

> Metro's interpretation of Section 17.16.250(D)(3)(b) makes a hash of the home occupation regulations. Under Metro's interpretation, Homeowners could host ten, twenty, or eighty

We find it unnecessary to address the meaning of "customer visits" because, even if Metro is correct, its interpretation would not affect Plaintiffs' equal protection claim. Plaintiffs' businesses would still be limited to scheduled appointments between the hours of 8:00 a.m. and 7:00 p.m., Monday through Saturday, and Plaintiffs would still have to keep a log of appointments. For this reason, we pretermit the issue of whether § 17.16.250(D) allows Plaintiffs to "do much of what they are requesting."

## II. SIMILARLY SITUATED[5]

Plaintiffs contend that their businesses are similarly situated to the Exempt Businesses "with regard to the purpose of 'balancing' home-based businesses and the residential nature of residential neighborhoods." Metro has not addressed this issue directly

---

customers at once—each arriving in their separate cars, or maybe together in a single bus—so long as they denominate that group a single "visit." After all, Metro insists that "visits can have multiple customers in attendance," and there is no apparent limit on the number of customers per visit. Relatedly, if a single customer visit can have multiple customers, how can Homeowners—or, more crucially, Metro code enforcers—distinguish between a single visit of four customers in an hour (permissible in Metro's view) and four visits of one customer in an hour (impermissible in Metro's view)? There is no guidance to constrain enforcement. And, perhaps most importantly, if there is no limit on customers per visit, as Metro argues, then how does the regulatory scheme reasonably further Metro's claimed interest in "preserving the sanctity of residential neighborhoods"? This question is particularly important given Metro's prior insistence that allowing Homeowners any customers would upset the sanctity of residential neighborhoods—indeed, that the absolute prohibition on customers was the very "lynchpin (sic)" of residential zoning. At no point does Metro explain how unlimited customers furthers the "balance" between home-based businesses and the residential nature of neighborhoods, even though the law must have a "real tendency to carry into effect the purposes" the government claims.

(Citations omitted).

[5] The use of a similarly situated analysis as a threshold test has been the subject of some well-reasoned criticism. *See* Giovanna Shay, *Similarly Situated*, 18 Geo. Mason L. Rev. 581, 615 (2011) (arguing that, under the multi-tiered scheme of judicial scrutiny, "'similarly situated' is another way of stating the fundamental values of the Equal Protection Clause" and "can be collapsed" into the rational basis inquiry); *Varnum v. Brien*, 763 N.W.2d 862, 884 n.9 (Iowa 2009) (questioning usefulness of similarly situated analysis as threshold test and noting that it is often infused "with principles traditionally applied in the complete equal protection analysis").

but suggests that comparing Plaintiffs' businesses to the Exempt Businesses is not an "apples-to-apples comparison."[6]

In evaluating whether two classes are similarly situated for purposes of an equal protection claim, courts focus on "relevant similarit[ies]" between the groups but do "not demand exact correlation." *Hargett*, 414 S.W.3d at 110 (quoting *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012)). In other words, the groups must be "similarly situated in *all material respects*." *Loesel*, 692 F.3d at 462 (citations omitted). A similarity is "material" when it relates to the purpose of the law being challenged. *See State of Ohio ex rel. Lloyd v. Dollison*, 194 U.S. 445, 447 (1904) (stating that equal protection claim could "only be sustained if the statute treat[s] plaintiff in error differently from what it does others who are in the same situation as he,—that is, in the same relation to the purpose of the statute."); *see also Hargett*, 414 S.W.3d at 110 (considering purpose of statute when determining whether in-person and absentee voters were similarly situated).[7]

Here, the purpose of the Customer Visit Restrictions is to limit the negative effects of non-resident patrons on residential neighborhoods, including increased parking and traffic congestion, noise, and criminal activity.[8]

We conclude that Plaintiffs' businesses are similarly situated in all material respects to home-based daycares, historic-home event venues, owner-occupied STRPs, and home-based businesses on property rezoned as SP districts with respect to the purpose of the law. Like Plaintiffs' businesses, these other businesses are operated in residential

---

[6] Metro attempts to distinguish cases that "show that a reasonable basis for a distinction is necessary to support a rational basis test" by asserting that those cases addressed "situations where an apples-to-apples comparison could be made."

[7] This definition of *similarly situated* is well-established. *See Application of Park*, 484 P.2d 690, 696 n.27 (Alaska 1971); *Darces v. Woods*, 679 P.2d 458, 467 (Cal. 1984); *Stuart v. Comm'r of Correction*, 834 A.2d 52, 56 (Conn. 2003); *Child Support Enf't Agency v. Doe*, 125 P.3d 461, 469 (Haw. 2005); *Varnum v. Brien*, 763 N.W.2d 862, 883 (Iowa 2009); *League of Women Voters of Kansas v. Schwab*, 549 P.3d 363, 383 (Kan. 2024); *Acorn v. City of New Orleans*, 377 So. 2d 1206, 1216 (La. 1979); *Sutherland v. State*, 537 So. 2d 1360, 1362 (Miss. 1989); *Arneson v. State By & Through Dep't of Admin., Teachers' Ret. Div.*, 864 P.2d 1245, 1248 (Mont. 1993); *Belkner v. Preston*, 332 A.2d 168, 171 (N.H. 1975); *Rodriguez v. Brand W. Dairy*, 378 P.3d 13, 20 (N.M. 2016); *Anderson v. Provo City Corp.*, 108 P.3d 701, 707 (Utah 2005); *Baker v. State*, 744 A.2d 864, 882 (Vt. 1999); *State v. Blilie*, 939 P.2d 691, 695 (Wash. 1997); *see also* 16B Am. Jur. 2d Constitutional Law § 915.

[8] Metro identifies reasons for *allowing* customer visits, such as giving "homeowners more opportunities to get by in increasingly expensive Nashville." The issue, however, is whether there were rational reasons for *limiting* customer visits to Plaintiffs' businesses.

neighborhoods by a resident of the home and rely on in-person visits from non-resident patrons.

Metro contends that comparing Plaintiffs' businesses to the Exempt Businesses is not an "apples-to-apples" comparison because the Exempt Businesses are subject to many other regulations. For example, historic-home event venues "must be in a historic structure" and may be limited in "the number and frequency of events." Home-based daycares must have a certain size lot and are subject to state licensing. And STRPs cannot rent to guests below a certain age, may not serve food, require special fire alarms, and must pay hotel taxes.

We rejected a similar argument by Metro in *Consolidated Waste Systems, LLC v. Metropolitan Government of Nashville and Davidson County, Tennessee*, No. M2002-02582-COA-R3-CV, 2005 WL 1541860 (Tenn. Ct. App. June 30, 2005). The ordinance at issue in *Consolidated Waste* prohibited the operation of construction and demolition ("C & D") landfills within two miles of a school or park. *Id*. at *2. The purpose of the ordinance was to protect schools and parks from dust, debris, and trash. *Id*. at *33. A would-be C & D landfill operator claimed that the ordinance violated its right to equal protection because the ordinance treated C & D landfills differently from other types of landfills. *Id*. at *8. On appeal, Metro argued that C & D landfills were not similarly situated to the exempt landfills because "other provisions of its Code as well as to State regulations" imposed "different requirements on different types of landfills." *Id*. at *34. We rejected that argument, reasoning that "the operational requirements imposed by the State [were] tailored to the specific activities carried on at the site." *Id*. at 35. Moreover, some of the exempt landfills were regulated more stringently. *Id*. Metro conceded that some of the exempt landfills posed "greater health and safety risks and/or disruption than C & D landfills," yet Metro could not "explain why only C & D landfills must be located more than two miles from parks and schools." *Id*. In other words, the exempt landfills were similarly situated with respect to the purpose of the law.

Here, the purpose of the Customer Visit Restrictions is to limit the negative effects of non-resident patrons on residential neighborhoods, including increased parking and traffic congestion, noise, and criminal activity. That the Exempt Businesses are regulated by other local and state regulations does not make those businesses differently situated for the purpose of the Customer Visit Restrictions.

### III. RATIONAL BASIS TEST

Plaintiffs assert that the Customer Visit Restrictions do not pass the rational basis test because there are no real and substantial differences between their businesses and the Exempt Businesses that are "germane to the purpose of the law." Metro disagrees, asserting that the rational basis test asks only whether the law is reasonably related to a proper legislative interest.

Plaintiffs rely on *State v. Tester*, 879 S.W.2d 823 (Tenn. 1994) as providing the proper standard. In *Tester*, the Tennessee Supreme Court observed that "there is no bright-line rule by which to distinguish a reasonable from an unreasonable classification" and provided the following guidance:

> [T]he classification must not be mere arbitrary selection. It must have some basis which bears a natural and reasonable relation to the object sought to be accomplished, and there must be some good and valid reason why the particular individual or class upon whom the benefit is conferred, or who are subject to the burden imposed, not given to or imposed upon others should be so preferred or discriminated against. ***There must be reasonable and substantial differences in the situation and circumstances of the persons placed in different classes which disclose the propriety and necessity of the classification.*** If legislation arbitrarily confers upon one class benefits, from which others in a like situation are excluded, it is a grant of a special right, privilege, or immunity, prohibited by the Constitution, and a denial of the equal protection of the laws to those not included . . . . ***The fundamental rule is that all classification must be based upon substantial distinctions which make one class really different from another; and the characteristics which form the basis of the classification must be germane to the purpose of the law***.

*Id.* at 829 (emphasis in original) (quoting *State v. Nashville, C. & St. L. Ry. Co.*, 135 S.W. 773, 776 (Tenn. 1911)).

*Tester* addressed a statute that divided counties into two classes: one comprised of Davidson, Shelby, and Moore counties, and the other comprised of all other counties. *Id.* at 825. In the first class, second time DUI offenders could serve their sentence in a work release program. *Id.* In the second class, DUI offenders could not serve their sentence in a work release program. *Id.* The State argued that the law did not violate the constitutional guarantee of equal protection because the jail facilities in Shelby, Davidson, and Moore were "overcrowded to the extent that there is a real and substantial distinction between those counties and the other 92 counties in the State." *Id.* at 829. The Court looked at the evidence in the record and disagreed that this was a real distinction:

> In our view, this argument ignores the evidence in this record, which indicates that ***Washington County*** has experienced serious jail overcrowding that was directly caused by the mandatory incarceration of ***second time DUI offenders.*** This overcrowding condition was sufficiently serious to require federal court intervention and orders requiring the County to remedy the unconstitutional overcrowding. In contrast, there is no evidence in the record to support the State's claim that the counties included within the law have, in fact, experienced jail overcrowding as a result of second time DUI offenders to a greater extent than the other 92 counties, nor is there any

- 12 -

evidence of the effect of work release on overcrowded jail conditions. Finally, the State's asserted rational basis is further undermined by the fact that Moore County, the second smallest county in the State with a population of 4,721 (1990 Census), is afforded the benefit of the classification, while more populous counties, such as Hamilton and Knox, are excluded.

The State makes an appealing policy argument that the legislative intent was to keep second offenders employed, to help defray the cost in counties, to support families involving minor children, and to allow offenders to meet their financial obligations. These goals, however admirable, apply equally to all second time offenders and provide no rational basis for distinguishing between the three counties to which the act is limited and all the other counties of the State.

*Id.* at 829.

In contrast, Metro relies on the standard articulated in *Riggs v. Burson*, 941 S.W.2d 44 (Tenn. 1997). The law in *Riggs* banned heliports within nine miles of the Great Smoky Mountains National Park. *Id*. at 47. The law's purpose was to reduce "the noise, disruption and safety risks caused by locating heliports near main roads and heavily populated areas." *Id*. at 50. The trial court held that the complaint failed to state a claim on which relief could be granted. *Id*. at 47. But this court remanded the case to allow the parties to introduce evidence on the statute's constitutional validity. *Id*. On appeal in the Tennessee Supreme Court, the plaintiffs asserted that there was "no evidence to support classifying helicopter operators within nine miles of the park different from any others in Tennessee." *Id*. at 53. The Supreme Court held that this evidence was unnecessary. *Id*. at 53. The Court explained that the inquiry was simply "whether there is a reasonably conceivable set of facts to justify the classification within the statute." *Id*. The Court found there was, namely, the protection of the Great Smoky Mountains National Park and its visitors from disruption and safety risks. *Id*. In other words, the Court found it unnecessary to consider whether there was a real distinction between heliports near the park and heliports in other areas of the state.

The rational basis test, as articulated in *Tester*, is the appropriate standard to apply in this case. When considering equal protection claims, our appellate courts have routinely considered whether actual distinctions between classes could provide a rational basis for differential treatment. *See, e.g.*, *Hughes v. Tennessee Bd. of Prob. & Parole*, 514 S.W.3d 707, 722 (Tenn. 2017) (treating indigent inmates differently than non-indigent inmates for the purpose of reducing litigation was justified because "indigent prisoners are more likely to have outstanding fees and they do not face the same financial deterrents at the beginning of litigation with which non-indigent prisoners contend"); *J.A.C. by & through Carter v. Methodist Healthcare Memphis Hosps.*, 542 S.W.3d 502, 522 (Tenn. Ct. App. 2016) (application of pre-suit notice requirement to healthcare liability claims but not others did not violate equal protection guarantee because of "the threat the increased malpractice insurance costs posed to health care affordability and accessibility"); *Sneyd v. Washington*

*Cnty.*, 387 S.W.3d 1, 8 (Tenn. Ct. App. 2012) (finding rational basis for different salaries for Circuit Court Clerk and Clerk and Master when "[t]he undisputed evidence show[ed] the contrasting duties between the two clerks' offices."); *Wyatt v. A-Best Prods. Co.*, 924 S.W.2d 98, 106 (Tenn. Ct. App. 1995) (upholding decision to treat asbestos-related claims differently from other latent-injury claims based on "the many factors which place asbestos-related injuries in a class by themselves" (citation omitted)), *as modified on reh'g* (Dec. 28, 1995).

We applied this standard most recently in *Metropolitan Government of Nashville and Davidson County v. Lee*, No. M2023-01678-COA-R3-CV, 2025 WL 1218089 (Tenn. Ct. App. Apr. 28, 2025). That case addressed a statute that reallocated authority to appoint commissioners to the Metropolitan Nashville Airport Authority ("MNAA"). *Id*. at *1. Under an earlier law, members were appointed by the Nashville mayor and approved by the Metro Council. *Id*. Under the new law, state elected officials had the authority to appoint eight of the ten members. *Id*. The new law, however, did not apply to other metropolitan airports. *Id*. Thus, Metro asserted that the law violated the equal protection provision of the Tennessee Constitution. *Id*. at *2.

In our analysis, we looked at evidence in the record to determine whether there were "actual distinctions between Nashville International Airport and other airports" that could "potentially provide a rational basis for the statutory differential treatment between it and other airport authorities." *Id*. at *18. We concluded that the evidence provided a rational basis because it showed that "Nashville International Airport ha[d] more than five times as many boarded passengers as the next closest Tennessee airport" and "[t]he economic effects of Nashville International Airport on the state [were] greater than the Chattanooga, Knoxville, and Memphis airports combined." *Id*. at *19. These facts justified the State's decision to exercise "greater state and regional influence over MNAA." *Id*.

Here, Plaintiffs have provided evidence that their businesses have no greater impact on the residential nature of neighborhoods than the Exempt Businesses. Metro has not disputed this evidence. For example, it was undisputed that Metro receives daily complaints about noise, traffic, parking, trash, and "general lewdness" associated with STRPs. Similarly, home-based daycares and historic-home event venues have generated complaints about noise, parking, and traffic.

Again, the only basis that Metro offers for distinguishing Plaintiffs' businesses from the Exempt Businesses is that the Exempt Businesses are subject to other restrictions that do not apply to Plaintiffs' businesses. Metro also points out that historic-home event venues and large home-based daycares require special exception permits, which may be subject to "other conditions that protect the residential nature of the neighborhood." In contrast, Metro says that home occupations are "accessory uses that are permitted as of right for *any* residential structure."

We rejected a similar argument in *Consolidated Waste*. There, Metro asserted that, even if C & D landfills were similarly situated to the exempt landfills, a rational basis existed for regulating them differently. *Consolidated Waste Systems, LLC*, 2005 WL 1541860, at *35. Metro reasoned that sanitary landfills required approval from the Metro Council but that C & D landfills did not. *Id*. Thus, the Council was "unable to review and control the placement of [C & D landfills] in proximity to parks and schools." *Id*. But we found this distinction irrelevant "to the question of whether there [was] a rational basis for an ordinance establishing the two-mile buffer on C & D landfills only." *Id*.

Metro also argues that courts cannot substitute their judgment on local land use policy for that of local legislative bodies. To be clear, we do not doubt whether Metro has a valid policy reason for limiting commercial activity in residential areas. And we are not second-guessing Metro's choice of tools to effectuate that policy. But the central issue in this case is whether Metro had a rational basis for imposing the Customer Visit Restrictions on home occupations such as Plaintiffs' but not the Exempt Businesses.

In short, Plaintiffs have presented evidence that there is no real distinction between their businesses and the Exempt Businesses that is relevant to the purpose of the Client Visit Restrictions, and Metro has not disputed that evidence. Further, Metro has offered no rational reason for the difference in treatment that is relevant to the purpose of the law.

For these reasons, we reverse the trial court's decision to grant summary judgment in favor of Metro as well as the denial of Plaintiffs' motion for summary judgment and remand for further proceedings consistent with this opinion.

## IN CONCLUSION

The judgment of the trial court is reversed, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against the Metropolitan Government of Nashville and Davidson County, Tennessee.

_____
FRANK G. CLEMENT JR., P.J., M.S.